Thomas J. Salerno (No. 07248)
Jeffrey Goulder (No. 010258)
Anthony P. Cali (No. 028261)
**STINSON LLP**
1850 N. Central Avenue, Suite 2100
Phoenix, Arizona 85004-4584
Tel: (602) 279-1600
Fax: (602) 240-6925
thomas.salerno@stinson.com
jeffrey.goulder@stinson.com
anthony.cali@stinson.com

*Counsel for Star Mountain Plan Trust*

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | Chapter 11 |
| STAR MOUNTAIN RESOURCES, INC., | Case No. 2:18-bk-01594-DPC |
| Debtor. | Adversary No. _____ |
| JARED PARKER, in his capacity as Plan Trustee for the Star Mountain Plan Trust, | |
| Plaintiff, | **COMPLAINT** |
| vs. | (Fraudulent Transfer, Breach of Fiduciary Duty, Equitable Subordination) |
| TITAN MINING (US) CORPORATION, a Delaware corporation; TITAN MINING CORPORATION, a British Columbia, Canada corporation; EDWARD BROGAN and JANE DOE BROGAN, husband and wife; DONALD SUTHERLAND and JANE DOE SUTHERLAND, husband and wife; JOSEPH HAMILTON MARCHAL and JANE DOE MARCHAL, husband and wife; MARK OSTERBERG and JANE DOE OSTERBERG, husband and wife; WAYNE RICH and JANE DOE RICH, wife and husband; JOHN AND JANE DOES 1-10; BLACK CORPORATIONS 1-10; WHITE PARTNERSHIPS 1-10; and GRAY TRUSTS 1-10. | |
| Defendants. | |

For his Complaint, Jared Parker, in his capacity as Plan Trustee for the Star Mountain Plan Trust, alleges as follows:

**PARTIES**

1. Star Mountain Plan Trust is a trust organized under the laws of Arizona. The Star Mountain Plan Trust was created as part of the Chapter 11 Plan of Liquidation for Star Mountain Resources, Inc. ("**Star Mountain**"), which was approved by the United States Bankruptcy Court for the District of Arizona on July 5, 2019.

2. Jared Parker, in his capacity as the Plan Trustee ("**Plaintiff**") is the duly appointed trustee of the Star Mountain Plan Trust.

3. Star Mountain filed a Chapter 11 bankruptcy case in the United States Bankruptcy Court for the District of Arizona on February 21, 2018 (the "**Petition Date**").

4. Pursuant to the Chapter 11 Plan of Liquidation for Star Mountain, the Plaintiff is authorized to prosecute the claims asserted herein.

5. Defendant Titan Mining (US) Corporation ("**Titan US**") is Delaware corporation whose assets include a high grade and fully permitted zinc mineral project in New York.

6. Defendant Titan Mining Corporation ("**Titan**") is a corporation organized under the laws of British Columbia, Canada.

7. Titan is a zinc exploration and development company and an affiliate of Augusta Capital Corporation ("**Augusta Capital**").

8. Titan US and Titan shall hereafter be collectively referred to as the "**Titan Defendants**".

9. Defendants Edward Brogan ("**Brogan**") and Jane Doe Brogan are husband and wife. At all relevant times, Brogan was a member of the Star Mountain Board of Directors (the "**Board**") and was acting for the benefit of his marital community.

10. Defendants Donald Sutherland ("**Sutherland**") and Jane Doe Sutherland are husband and wife. At all relevant times, Sutherland was a member of the Board and was acting for the benefit of his marital community.

11. Defendants Joseph Hamilton Marchal ("**Marchal**") and Jane Doe Marchal are husband and wife. At all relevant times, Marchal was the Chief Executive Officer and member of the Board and was acting for the benefit of his marital community.

12. Defendants Mark Osterberg ("**Osterberg**") and Jane Doe Osterberg are husband and wife. At all relevant times, Osterberg was the President and COO of Star Mountain and was acting for the benefit of his marital community.

13. Defendants Wayne Rich ("**Rich**") and Jane Doe Rich are husband and wife. At all relevant times, Rich was the Chief Financial Officer of Star Mountain and was acting for the benefit of his marital community.

14. Brogan, Sutherland, Marchal, Osterberg, and Rich shall hereafter be collectively referred to as the "**D&O Defendants**". The acts of the D&O Defendants were performed on behalf of marital communities.

15. The true names of all John Doe, Jane Doe, Black Corporation, White Partnership and Gray Trust Defendants are unknown to Plaintiff at the time of the filing of this Complaint, and Plaintiff, therefore, sues them through fictitious names. Plaintiff will ask leave of Court to amend this Complaint to reflect the true names of these unknown Defendants if and when they have been ascertained.

**JURISDICTION AND VENUE**

16. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b).

17. This is a core proceeding over which this Court has jurisdiction pursuant to 28 U.S.C. § 157(b)(2) and § 1334.

18. Venue is proper before this Court pursuant to 28 U.S.C. § 1409.

19. This matter is asserted pursuant to Bankruptcy Code § 541, 544, 548, and 550.

**GENERAL ALLEGATIONS**

20. Star Mountain is a Nevada corporation formed to acquire and consolidate mining claims, mineral leases, producing mines, and historic mines for production and future growth.

## The Purchase of the Balmat Assets

21. On November 2, 2015, Star Mountain acquired a one-hundred percent (100%) interest in Northern Zinc, LLC ("**Northern Zinc**"), a Nevada limited liability company pursuant to a Purchase Agreement dated October 13, 2015 (the "**NZ Purchase Agreement**"), by and among Star Mountain, Northern Zinc, and Northern Zinc's sole member Aviano Financial Group, LLC ("**Aviano**"), a Delaware limited liability company.

22. Concurrent with Star Mountain's purchase of Northern Zinc, Northern Zinc acquired (a) one-hundred percent (100%) of the issued and outstanding common stock of Balmat Holding Corporation ("**Balmat**") and its wholly owned subsidiary, St. Lawrence Zinc Company, LLC ("**SLZ**"), the owner of the mining property known as the Balmat Zinc Mine located in upstate New York (the "**Balmat Mine**") and (b) certain mining and processing equipment (together with the Balmat Mine, the "**Balmat Assets**") pursuant to a Purchase Agreement between Northern Zinc, Star Mountain, Hudbay Minerals Inc. ("**Hudbay**"), Balmat, and SLZ dated October 13, 2015 (the "**Balmat Purchase Agreement**").

23. As a result of the NZ Purchase Agreement and the Balmat Purchase Agreement, Star Mountain owned and controlled the Balmat Assets.

24. On or around, September 30, 2015, the D&O Defendants caused Star Mountain to issue 5,000 shares of Series B Preferred stock to Summit Capital USA, Inc., an insider of Star Mountain. Holders of Star Mountain's Series B Preferred stock are entitled to one hundred (100) votes per share.

25. On or around September 30, 2015, the D&O Defendants caused Star Mountain to issue 1,000,000 share of common stock to Marchal, 1,000,000 share of common stock to Brogan, 50,000 shares of common stock to Sutherland, 50,000 shares of common stock to Donna Moore, the Controller of Star Mountain, and 50,000 shares of common stock to Doug MacLellan, a director on the Board.

26. On or around October 31, 2015, the D&O Defendants caused Star Mountain to issue 3,130,000 shares of Series C Preferred stock, including 1,500,000 shares to Brogan and 500,000

shares to Marchal. Holders of Star Mountain's Series C Preferred stock are entitled to ten (10) votes per share.

27. Upon information and belief, the D&O Defendants caused Star Mountain to issue additional stock after the purchase of the Balmat Assets in order to give insiders majority voting control of the company.

28. At the time of Star Mountain's purchase, the Balmat Mine was a fully permitted mine.

29. As part of the NZ Purchase Agreement, the D&O Defendants caused Star Mountain to represent that it would have "on a consolidated basis, sufficient funds (a) to complete the closing pursuant to the Balmat Purchase Agreement, including cash of at least $2 million for the care and maintenance of the Balmat Mine, and (b) to complete the Closing pursuant to this Agreement."

<u>Star Mountain's Cash Shortage and Burdensome Loans</u>

30. Upon information and belief, Star Mountain did not have sufficient capitalization for the care and maintenance of the Balmat Mine at the time it executed the NZ Purchase Agreement and/or shortly thereafter.

31. In a letter to the Board dated February 10, 2016, Marchal noted that Star Mountain's "cash position is extremely low and to the point that we risk running out of cash in roughly three weeks unless we can secure additional funding."

32. On March 15, 2016, within a few months of closing of the NZ Purchase Agreement, Star Mountain secured a $500,000 loan from the Development Authority of the North Country for general working capital purposes.

33. On May 12, 2016, Marchal and Brogan each loaned Star Mountain $125,000. In exchange for the loans, Star Mountain issued one convertible note in the aggregate principal amount of $250,000 to Marchal and Brogan bearing simple interest at the rate of 15% per annum and payable by Star Mountain on or before June 30, 2017 (the "**Directors' Note**").

34. On June 28, 2016, Star Mountain entered into an agreement with TCA Global Credit Master Fund, LP ("**TCA**"), whereby Star Mountain issued to TCA $5,000,000 of senior secured convertible, redeemable Debentures (the "**Debentures**"). TCA ultimately purchased $3,000,000

of the Debentures, with an option to purchase an additional $2,000,000 upon mutual agreement with Star Mountain.

35. The $3 million Debentures bore interest at 18% per annum. Pursuant to the Debentures, Star Mountain agreed to make monthly payments of principal and interest to TCA, except for the first two monthly payments after the execution of the Debentures, which would consist of interest only.

36. Beginning on the third month after the closing date of the Debentures, the entire principal amount of the Debentures was to be amortized in equal payments over the next ten (10) months along with interest on the unpaid balance until the maturity date, which was twelve (12) months after the closing date.

37. To secure its obligations under the Debentures, Star Mountain executed a security agreement in favor of TCA which encumbered all of Star Mountain's assets and included a pledge agreement covering Star Mountain's ownership interests in all of its subsidiaries.

38. The D&O Defendants allowed the $3,000,000 TCA Debentures to be collateralized by all of the Balmat Assets despite the fact that the Balmat Assets were worth significantly more than $3,000,000.

39. On or about June 28, 2016, the D&O Defendants caused the Directors' Note to be paid in full from the proceeds of the TCA Debentures even though the Directors' Note was not due for approximately one more year.

40. After payment of fees and costs associated with the Debentures financing, the Directors' Note, and other debt, Star Mountain was left with less than $850,000 from the proceeds of the Debentures which it could use for operations. This amount represented only approximately three months of operating capital for Star Mountain.

### The Titan Sale

41. On June 28, 2016, Star Mountain appointed Donald Taylor ("**Taylor**") as a new member of its board of directors and confirmed the previous appointments of its four other members -- Marchal (Chairman of the Board), Brogan, Sutherland, and Douglas MacLellan.

42. At the same time Taylor was serving as a member of the Star Mountain Board, he was also employed as the Chief Operating Officer and as a director of Arizona Mining, Inc. ("**Arizona Mining**").

43. Augusta Capital is owned or controlled by Richard Warke and is affiliated with Titan US. Titan US is a subsidiary of Titan and each is, or was at all relevant times, an affiliate of Augusta Capital, Augusta Investments Inc., and Arizona Mining. Collectively, these entities comprise Augusta Group of Companies (the "**Augusta Group**") and each entity in the Augusta Group is owned or controlled, or was owned or controlled at all relevant times, either directly or indirectly, by Richard Warke.

44. Taylor is identified as a "team member" on the Augusta Group website. Upon information and belief, Taylor was a "team member" of the Augusta Group at all times relevant to this Complaint.

45. At or around the time Star Mountain executed the Debentures with TCA, Taylor suggested a possible sale of the Balmat Assets to Richard Warke or one of his companies.

46. The D&O Defendants authorized the TCA Debentures in order to bridge Star Mountain to the sale to the Titan Defendants.

47. Prior to authorizing the TCA Debentures, the D&O Defendants did not cause Star Mountain to market the Balmat Assets for sale.

48. On or about September 23, 2016, the Star Mountain Board executed a Unanimous Written Consent (the "**9/23/16 UWC**") authorizing the company to enter into a letter of intent with Augusta Capital for the sale of the Balmat Assets.

49. The 9/23/16 UWC noted that discussions that would have provided Star Mountain with financing necessary to meet its payments to TCA had not materialized.

50. The 9/23/16 UWC was signed by Marchal, Brogan, Douglas MacLellan, Sutherland, and Taylor.

51. In its quarterly financial report for the quarter ended September 30, 2016, Star Mountain noted that it had incurred losses in the previous two years, that it had total currents assets of $1,050,000 and total current liabilities $6,092,000 resulting in a negative working capital balance

of $5,042,000 as of September 30, 2016, and that it anticipated further losses in the conduct of its business. The notes to Star Mountains' condensed consolidated financial statements for the same period expressed "substantial doubt" about Star Mountain's ability to continue as a going concern.

52. On or about October 15, 2016, after making only one principal and interest payment, Star Mountain defaulted on its payment obligations under the Debentures.

53. On or about October 27, 2016, Star Mountain signed a binding letter of intent with Augusta Capital (the "**Augusta LOI**"), thereby initiating a transaction in which Star Mountain would sell, through its wholly-owned subsidiary Northern Zinc, the Balmat Assets by selling Northern Zinc's 100% ownership interest in Balmat Holding Corporation, whose wholly-owned subsidiary, SLZ, owned the Balmat Assets.

54. Upon information and belief, Star Mountain was insolvent at the time it entered into the Augusta LOI, as it could not pay its debts as they became due.

55. Upon information and belief, Star Mountain and the D&O Defendants did not notify creditors, shareholders, or investors regarding its discussions with Augusta prior to Star Mountain executing the Augusta LOI.

56. On November 2, 2016, Taylor along with the other directors of Star Mountain, approved the planned sale of the Balmat Assets to Augusta Capital and authorized actions taken by Star Mountain to consummate the sale. At this same time, Taylor was also a member of the Augusta Group, which included Augusta Capital and the Titan Defendants.

57. On November 3, 2016, in connection with the approved Augusta LOI, Augusta Capital, through an affiliate, acquired the TCA Debentures and all of TCA's collateral and other rights.

58. Upon information and belief, Augusta and/or one of its affiliates purchased the TCA Debentures at a discount from the face value of the obligation.

59. On November 3, 2016, Augusta entered into a forbearance agreement with Star Mountain related to the TCA Debentures (the "**Forbearance Agreement**"). The Forbearance Agreement reflected Star Mountain's acknowledgement that the TCA Debentures was in default as a result of Star Mountain's failure to make payments that were due and owing.

60. The Star Mountain Board authorized the Company to enter into the Forbearance Agreement with Augusta pursuant to a Unanimous Written Consent dated November 2, 2016 (the "**11/2/2016 UWC**"). The 11/2/2016 UWC was signed by Marchal, Brogan, Sutherland, and Taylor.

61. On November 4, 2016, in a Form 8-K to be filed with the Securities and Exchange Commission (the "**SEC**"), Star Mountain acknowledged that it was unable to make payments due under the TCA Debentures and other debt obligations, or to finance the care and maintenance activities of the Balmat Assets.

62. Prior to November 14, 2016, the date Star Mountain's Form 10-Q for the quarter ended September 30, 2016 would have been due, Star Mountain filed a Form 15 with the SEC to begin the process of deregistering its stock.

63. Star Mountain's filing of the Form 15 suspended its obligations to file certain reports with the SEC, including the annual, quarterly, and current reports on Forms 10-K, 10-Q, and 8-K.

64. Star Mountain's Board authorized the filing of the Form 15 to facilitate the sale of the Balmat Assets and to avoid having to provide notice of the proposed sale to its shareholders.

65. Upon information and belief, and as a result of his position as a director of Star Mountain, and his access to the financials of Star Mountain, Taylor had knowledge that Star Mountain was insolvent at the time he approved the Augusta LOI.

66. Taylor participated in Star Mountain Board discussion regarding the potential sale of the Balmat Mine to Augusta Capital or an Augusta Capital affiliate.

67. At the time of the execution of the Augusta LOI, Taylor exercised a degree of influence or control over the Augusta Group (including the Titan Defendants) and Star Mountain.

68. Based upon Taylor's position with the Augusta Group, the Augusta Group and its affiliates, including Titan, had knowledge that Star Mountain was insolvent at the time of the Augusta LOI and subsequent transactions.

69. On December 2, 2016, certain minority shareholders sent a letter (the "**12/2/16 Shareholder Letter**") to the D&O Defendants demanding an immediate suspension of any further transactions in furtherance of the Augusta LOI. The 12/2/16 Shareholder Letter called the Augusta LOI, "the culmination of a series of reckless and ill-conceived actions and omissions by Star

Mountain's management team and board of directors, the result of which will be the complete loss of the company's singular identifiable valuable asset and business opportunity . . . ."

70. The 12/2/16 Shareholder Letter labeled the D&O Defendants' decision to enter into the TCA Debentures "calamitous" and noted that the terms of the Debentures were "so onerous that an eventual default by Star Mountain was entirely predictable and virtually guaranteed to occur."

71. According to the 12/2/16 Shareholder Letter, and upon information and belief, the D&O Defendants had other viable financing opportunities at the time the Debentures was executed that they refused to consider because those opportunities were conditioned on the replacement of certain officers and directors.

72. The authors of the 12/2/16 Shareholder Letter also expressed concern about Taylor's affiliation with Richard Warke and the Augusta Group and questioned whether Taylor's conflict of interest in the transaction with Augusta and its affiliated companies had been properly addressed and disclosed.

73. Upon information and belief, the D&O Defendants and Star Mountain did not respond to the 12/2/16 Shareholder Letter.

74. On December 9, 2016, Taylor tendered his resignation as a member of the Board, while maintaining his position as a member of the Augusta Group.

75. On December 12, 2016, the same minority shareholders sent another letter to the D&O Defendants (the "**12/12/16 Shareholder Letter**"). The 12/12/16 Shareholder Letter indicated that the minority shareholders were aware of two separate groups that had expressed strong interest in purchasing the Balmat Assets at a premium to the Augusta LOI.

76. The 12/12/16 Shareholder Letter requested that any sale of the Balmat Assets be postponed for at least another month and that Marchal and Brogan return the $250,000 set aside for themselves from the TCA Debentures in order to cover operating expenses through January 2017.

77. Upon information and belief, the D&O Defendants and/or Star Mountain did not respond to the 12/12/16 Shareholder Letter and no efforts were made to explore a potential sale of the Balmat Assets to another group.

78. On December 30, 2016, Star Mountain executed the Purchase Agreement between Titan US, Titan, Northern Zinc, Star Mountain, Balmat holding, and SLZ (the "**Titan Purchase Agreement**"), which effectuated the sale of the Balmat Assets to the Titan Defendants (the "**Titan Sale**").

79. At the time of the Titan Sale, Star Mountain was not paying its debts as they become due.

80. Upon information and belief, Star Mountain was insolvent on or shortly after the Titan Sale as the sum of all its debts were greater than all of Star Mountain's asserts at fair valuation.

81. At or around the time of the Titan Sale, and due to issuances of Series B and Series C Preferred Stock, insiders of Star Mountain, including the D&O Defendants, controlled 47,468,128 voting share of Star Mountain Stock, or approximately 67.78% of the company's outstanding voting shares.

82. According to the Titan Purchase Agreement, the sale price of the Balmat Assets was approximately $39.8 million in cash and assumption of debt plus issuance of 2,968,000 shares of Titan common stock, representing five percent (5%) of Titan's issued and outstanding stock. The cash and debt assumption portion of the purchase price was payable as follows: (1) cash consideration in the amount of $3,000,000, with $1,000,000 payable on the closing date, and the remaining $2,000,000 to be paid pursuant to a promissory note (the "**Titan Note**") payable $500,000 three months after the closing date, $500,000 six months after the closing date, $500,000 nine months after the closing date, and $500,000 twelve months after the closing date; (2) assumption of pre-closing liabilities related to the operations of the Balmat Mine in the amount of $81,421; (3) assumption and release of debts of Star Mountain in the amount of $3,318,794 (the TCA Debentures); (4) assumption of reclamation liabilities related to the Balmat Mine in the amount of $17,906,326, and (5) assumption of post-closing payment obligations to Hudbay as provided for in the Balmat Purchase Agreement.

83. Upon information and belief, the portion of the purchase price noted as the assumption of reclamation liabilities related to the Balmat Mine in the amount of $17,906,326 was not consideration conveyed by the Titan Defendants to Star Mountain.

84. Upon information and belief, the Titan Defendants have not paid the Hudbay obligations in full.

85. Although the Titan Defendants assumed the Hudbay obligations as provided for in the Balmat Purchase Agreement, there was no novation of such obligations.

86. After the Titan Sale, Star Mountain continues to be obligated to make payments pursuant to the Hudbay Purchase Agreement subject to indemnity rights that it has against Titan pursuant to the Titan Purchase Agreement.

87. In their security filings for the quarter ended September 30, 2018, the Titan Defendants reported the purchase price of the Balmat Assets at $16,428,269. Upon information and belief, this amount includes the assumption of the Hudbay obligations that have not been paid by the Titan Defendants.

88. Upon information and belief, the Balmat Assets were worth substantially more than $16,428,269 at the time of the Titan Sale.

89. The Titan Defendants' initial public offering materials in October 2017 noted that "[e]stimated production capital cost per the Technical Report of $10.7 million is modest compared to forecast after-tax cash flow of $210.7 million . . . ."

90. Upon information and belief, Star Mountain received $1 million in cash from the Titan Defendants pursuant to the Titan Note upon the execution of the Titan Purchase Agreement.

91. Star Mountain has not received the final two installments, or approximately $1 million, under the Titan Note.

92. The value received by Star Mountain in the Titan Sale was not reasonably equivalent to the value of the Balmat Assets.

93. Prior to the Titan Sale, Star Mountain did not engage an appraiser to appraise the Balmat Assets.

94. Prior to the Titan Sale, Star Mountain did not obtain a third-party fairness opinion regarding the Titan Sale.

95. Prior to the Titan Sale, Star Mountain did not engage a broker to market the Balmat Assets.

96. Prior to the Titan Sale, Star Mountain did not engage an investment banker or any other professional to assist in selling the Balmat Assets.

97. Prior to the Titan Sale, Star Mountain did not retain a bankruptcy professional or consider filing bankruptcy to prevent foreclosure of the Balmat Assets.

98. After the sale of the Balmat Assets to the Titan Defendants, Star Mountain was left with no substantive assets aside from a mine project in Beaver County, Utah (the "**Chopar Mine**").

99. Upon information and belief, the Chopar Mine is of negligible value and has not been developed.

100. Upon information and belief, immediately following the closing of the Titan Sale, Star Mountain's only other remaining assets aside from the Chopar Mine was less than $1,000,000 in cash, and shares of Titan, which Star Mountain could not liquidate at or around the time of the Titan Sale.

## COUNT I

Fraudulent Transfer Under Bankruptcy Code §§ 544, 548, and 550;

Nev. Rev. Stat. § 112.140 et seq.

101. Plaintiff hereby re-alleges and incorporates paragraphs 1 through 100 as if fully set out herein.

102. Star Mountain, within two (2) years of the Petition Date, transferred the Balmat Assets to the Titan Defendants.

103. Star Mountain transferred the Balmat Assets to the Titan Defendants with actual intent to hinder, delay, or defraud its creditors.

104. Star Mountain received less than reasonably equivalent value for the Balmat Assets in the Titan Sale.

105. Star Mountain was insolvent at the time of the Titan Sale.

106. Star Mountain transferred the Balmat Assets for less than reasonably equivalent value and caused Star Mountain to become insolvent after the transfer was made.

107. Star Mountain transferred the Balmat Assets for less than reasonably equivalent value and at a time when Star Mountain was engaged in business or a transaction, or was about to

engage in business or a transaction, for which any property remaining with Star Mountain amounted to unreasonably small capital.

108. Star Mountain transferred the Balmat Assets for less than reasonably equivalent value and at a time when Star Mountain was engaged in business or a transaction, or was about to engage in business or a transaction, for which its remaining assets were unreasonably small in relation to the business or the transaction.

109. Star Mountain transferred the Balmat Assets for less than reasonably equivalent value and at a time when it intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as they matured.

110. Star Mountain has multiple creditors as to whom the transfer of the Balmat Assets are avoidable or voidable under applicable state law and who hold unsecured claims against Star Mountain allowable under Bankruptcy Code § 502.

111. Plaintiff is entitled to avoid the transfer of the Balmat Assets under applicable non-bankruptcy law as incorporated into Bankruptcy Code § 544.

112. Plaintiff is entitled to avoid the transfer of the Balmat Assets under Bankruptcy Code § 548.

113. Plaintiff is entitled to recover the transfer of the Balmat Assets or their value under Bankruptcy Code § 550(a)(1) from the Titan Defendants as the initial transferee of the Balmat Assets.

114. Plaintiff is entitled to recover the transfer of the Balmat Assets or their value under Bankruptcy Code § 550(a)(2) from the Titan Defendants as an immediate or mediate transferee because the Titan Defendants did not receive the transfer of the Balmat Assets for value, in good faith, or without knowledge that the transfers were avoidable.

## **COUNT II**

### Breach of Fiduciary Duty

115. Plaintiff hereby re-alleges and incorporates paragraphs 1 through 114 as if fully set out herein.

116. For all relevant time periods, the D&O Defendants were officers, directors and/or managers of Star Mountain and owed fiduciary duties to Star Mountain.

117. The D&O Defendants authorized Star Mountain's purchase of the Balmat Assets without adequate capitalization or financing.

118. At the time Star Mountain purchased the Balmat Assets, the D&O Defendants allowed the company to make the false representation that it had sufficient capital which it could use to operate the Balmat Mine.

119. Star Mountain was inadequately capitalized at the time of the purchase of the Balmat Assets and, therefore, had to incur onerous debt and eventually sell the Balmat Assets under extraordinarily unfavorable conditions, thereby damaging the company.

120. The D&O Defendants elected to deregister Star Mountain's securities prior to the sale of the Balmat Assets to the Titan Defendants to avoid having to garner shareholder approval.

121. The D&O Defendants failed to provide notice of the Titan Sale to all shareholders. The Titan Sale did not generate enough return to pay creditors and recoup shareholder investments.

122. The D&O Defendants failed to engage a broker to market the Balmat Assets.

123. The D&O Defendants failed to engage an investment banker or other professional to assist in selling the Balmat Assets.

124. The D&O Defendants did not retain a bankruptcy professional or consider filing bankruptcy to prevent foreclosure of the Balmat Assets.

125. Marchal and Brogan utilized proceeds of the TCA Debentures to pay off their Directors' Note prior to its maturity date.

126. Upon information and belief, the D&O Defendants decision to sell the Balmat Assets was motivated, in part, by Marchal's and Brogan's desire to be repaid on their loans.

127. Marchal and Brogan's fiduciary duties required them to put Star Mountain's interests ahead of their own interests.

128. The D&O Defendants failed to procure a fairness opinion when deciding to sell the Balmat Assets to the Titan Defendants.

129. The D&O Defendants chose to sell the Balmat Assets to the Titan Defendants at the recommendation of a Board member, Taylor, who was an insider of affiliates of the Titan Defendants.

130. The D&O Defendants allowed Taylor to vote in favor of the Augusta LOI, though he was not a disinterested person when he voted in favor of the Augusta LOI.

131. Taylor's vote in favor of the Augusta LOI violated Star Mountain's bylaws and its ethics policy.

132. The D&O Defendants failed to explore a sale of the Balmat Assets to the potential acquirers brought to their attention in the 12/12/16 Shareholder Letter.

133. The D&O Defendants made issuances of Star Mountain stock to insiders which diluted the shares owned by, among others, Aviano. The D&O Defendants caused these shares to be issued though Star Mountain represented to Aviano that it would not dilute Aviano's shares.

134. Based upon the foregoing, the D&O Defendants breached their fiduciary duties to Star Mountain, entitling Plaintiff to compensatory damages in an amount to be proven at trial.

135. Upon information and belief, the D&O Defendants' conduct was done in conscious disregard of significant harm caused to Star Mountain, its shareholders, and its investors. The D&O Defendants acted deliberately, overtly, and dishonestly, entitling Plaintiff to punitive damages.

## **COUNT III**

Equitable Subordination Under Bankruptcy Code § 501(c)

136. Plaintiff hereby re-alleges and incorporates paragraphs 1 through 135 as if fully set out herein.

137. Star Mountain's bankruptcy schedules reflect a claim for Brogan against Star Mountain's bankruptcy estate in the amount of $738,410.97 (the "**Brogan Claim**") based on "convertible debt." Case No. 2:18-bk-01594-DPC; Dkt. No. 20.

138. Star Mountain's bankruptcy schedules reflect a claim for Marchal against Star Mountain's bankruptcy estate in the amount of $338,438.38 (the "**Marchal Claim**") based on "convertible debt." Case No. 2:18-bk-01594-DPC; Dkt. No. 20.

139. In breaching their fiduciary duties to Star Mountain in the manner described herein, Brogan and Marchal engaged in inequitable conduct.

140. Brogan and Marchal's misconduct has resulted in injury to the creditors of Star Mountain.

141. Brogan and Marchal's misconduct, including, but not limited to, causing their Directors' Note to be paid first from the proceeds of the Debentures, conferred unfair advantages on Brogan and Marchal.

142. The subordination of the Brogan Claim and Marchal Claim is necessary to offset the harm that the bankruptcy estate has suffered as a result of Brogan and Marchal's misconduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests the following relief:

A. Avoidance of the Balmat Asset transfer pursuant to Bankruptcy Code §§ 544 and 548 and/or Nevada Revised Statute §112.140, et seq.

B. For recovery of the Balmat Asset transfer or its value pursuant to Bankruptcy Code § 550 and/or Nevada Revised Statute §112.140, et seq.

C. For compensatory damages against the D&O Defendants for breach of fiduciary duty.

D. For punitive damages against the D&O Defendants based upon their extreme conduct in breaching their fiduciary duties to Star Mountain.

E. For equitable subordination of the Brogan Claim and Marchal Claim pursuant to Bankruptcy Code § 510(c).

F. Pre- and post-judgment interest; and

G. For such other and further relief as is just and equitable.

1 | DATED this 19th day of November, 2019.

2 | **STINSON LLP**

3 | By: /s/ Anthony P. Cali
4 | Thomas J. Salerno
Jeffrey Goulder
5 | Anthony P. Cali
1850 N. Central Avenue, Suite 2100
6 | Phoenix, Arizona 85004-4584

7 | *Counsel for Star Mountain Plan Trust*